UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

[UNDER SEAL],

             Plaintiff,

    v.

[UNDER SEAL],

             Defendants.

Case No.

**COMPLAINT**

**(FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3729 <u>et</u> <u>seq</u>)**

1080879.3

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel KRYSTAL SPENCER and ANNA CROWELL,<br><br>    Plaintiffs,<br><br>  v.<br><br>AMPHARM, INC.; AMERICAN HEALTH COMPANIES, INC. AND TENNESSEE HEALTH MANAGEMENT, INC.,<br><br>    Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT** [31 U.S.C. §§ 3729 et seq.]<br><br>**JURY TRIAL DEMANDED** |

1080879.3

Plaintiffs Krystal Spencer and Anna Crowell ("Relators") hereby file this Complaint against Defendants.

## INTRODUCTION

This action is based on Defendant AmPharm, Inc.'s fraudulent schemes to defraud Medicare through improper recycling, multiple billing, and false refill dating of drugs for nursing home patients. Spencer and Crowell alleged that AmPharm knowingly submitted, and caused to be submitted, false claims to Medicare for drugs prescribed to patients of nursing facilities run by AmPharm's sister entity, Defendant Tennessee Health Management, Inc. ("THM"). Both Ampharm and THM are wholly-owned subsidiaries of Defendant American Health Companies, Inc. ("AHC"). Spencer and Crowell uncovered these violations in their roles as AmPharmVice President of Finance and Accounts Receivable Clerk, respectively.

Relators bring this *qui tam* action on behalf of themselves and the United States to recover damages and civil penalties arising from Defendants' violations of the 31 U.S.C. § 3729(a)(1) through conduct described in detail below.

## JURISDICTION AND VENUE

1. This is a civil action arising under the laws of the United States to redress violations of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. Relators are authorized to bring this private action on behalf of themselves and the United States under 31 U.S.C § 1330(b)(1).

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

3.     Venue is proper in this District because: Defendants, or at least one of them, can be found, reside, or transact or have transacted business in the Middle District of Tennessee. 31 U.S.C. § 3732(a).  Some of the THM homes served by AmPharm, including Bethesda Health Care Center, Clarksville Nursing and Rehabilitation Center, Inc., Cumberland Manor Nursing Center, Lewis County Nursing and Rehab Center, Meadowbrook Health and Rehabilitation Center, Mt. Juliet Health Care Center, Northside Healthcare and Rehab Center, Vanco Manor Nursing and Rehabilitation and Waverly Health Care and Rehabilitation Center, are located in the Middle District of Tennessee.

## THE PARTIES

4.     Relator Spencer served as Vice President of Finance at AmPharm from January 25, 2011 to March 15, 2012.  In that position she oversaw accounting and billing and was the final point of escalation for accounts receivable. She was also responsible for overseeing posting of Medicare payments.

5.     Relator Crowell served as Accounts Receivable Clerk at AmPharm from April 2011 to June 2012.  In this capacity, Crowell received all payments that came into the building from all payer sources, including facility and private, posted the payments and sent them to the bank.

1080879.3

6.    Defendant AmPharm is a Tennessee corporation, headquartered in Parsons, Tennessee.  AmPharm is a wholly-owned subsidiary of AHC under which AHC operates a pharmaceutical business.  AmPharm transacts business by, among other things, supplying medication to nursing facilities throughout the state, including certain facilities in the Middle District of Tennessee.

7.    Defendant THM is a Tennessee corporation, headquartered in Parsons, Tennessee.  THM is also an AHC subsidiary.  THM manages nursing home facilities through the state of Tennessee, including in the Middle District.

8.    Defendant AHC is a Tennessee corporation, headquartered in Parsons, Tennessee.  AHC owns approximately 35 nursing facilities throughout the state, including in the Middle District of Tennessee.

9.    Relators allege that Defendants are alter egos of one another.

10.    AHC exercised complete control over AmPharm and THM and used that control to submit and cause to be submitted false claims to the federal government.  AHC's exercise of control and relationship to AmPharm and THM satisfy the standards to invoke the alter ego under Tennessee and federal common law.

11.    Based on information and belief, until 2012, James Smith was the Chief Executive Officer of at least AmPharm and AHC, and apparently THM also.  In 2012, Dennis Barry, formerly the head of AmMed, Inc.—another AHC subsidiary—took over for James Smith as Defendants' CEO.  James Parrish is the General Counsel and Secretary of AHC and THM and sits on the Board of Directors for THM.

- 3 -

1080879.3

12.     Ampharm, THM and AHC share the same address and offices Parsons, Tennessee.

13.     AmPharm's cash assets were placed in AHC accounts.  When Relator Spencer was terminated she received ESOP materials entitled "AHC ESOP," but with a THM address for inquiries. AHC is also mentioned in her health insurance and 401(k) documents.

14.     The drug return report provided by Relators lists each return as provided to "THMAHC."

## FACTUAL ALLEGATIONS

I.     Overview

15.     This case concerns false claims that AmPharm submitted and caused to be submitted to the federal government through the Medicare program.  Long term care pharmacies such as AmPharm bill Medicare directly for the drugs they provide to nursing home patients with coverage under Medicare Part D, with each prescription discretely billed. Part D patients are those with Medicare who remain at a nursing home past the 100 days of coverage provided under Medicare A.  For patients covered under Medicare Part A, nursing homes such as the THM homes bill Medicare a per diem rate that covers all services, including prescription drugs.

16.     AmPharm supplied prescription medications to approximately 31 nursing homes managed by THM.  The homes include Applingwood Healthcare Center; Bethesda Health Care Center; Bright Glade Health and Rehabilitation Center; Clarksville Nursing and Rehabilitation Center, Inc.; Covington Care Nursing and Rehabilitation Center, Inc.; Covington Manor Nursing and Rehabilitation, Inc.; Crestview Health Care and

1080879.3

Rehabilitation, Inc.; Cumberland Manor Nursing Center; Decatur County Manor; Dyersburg Manor; East Tennessee Health Care; Forest Cove Nursing and Rehab Center; Harbor View Nursing and Rehabilitation Center; Humboldt Healthcare and Rehab Center; Lewis County Nursing and Rehab Center; Lexington Manor; McKenzie Healthcare and Rehabilitation Center; McNairy County Health Care Center; Meadowbrook Health and Rehabilitation Center; Millennium Nursing and Rehab Center; Mt. Juliet Health Care Center; Northbrooke Healthcare and Rehab Center; Northside Healthcare and Rehab Center; Paris Health Care Nursing and Rehabilitation Center; Savannah Health Care and Rehabilitation Center; Union City Nursing and Rehabilitation Center; VanAyer Healthcare and Rehab Center; Vanco Manor Nursing and Rehabilitation; Waverly Health Care and Rehabilitation Center; West Tennessee Transitional Care; and Westwood Health Care and Rehabilitation Center.

17.     AmPharm was the only pharmacy servicing these homes.  An average of 100 patients at each nursing home received prescription drugs, with each of those patients averaging eight to ten prescriptions each.

18.     Relators allege that AmPharm engaged in several related schemes to defraud Medicare.  First, AmPharm perpetrated a drug recycling scheme in which it systematically retrieved, repackaged and represcribed unused portions of medications previously delivered to THM nursing home patients.  This allowed AmPharm to bill Medicare multiple times for the same pill. It also meant that Medicare paid both AmPharm and the homes (through the per diem rate) for drugs prescribed in violation of federal and state regulations and guidelines regarding drug return and reuse.

1080879.3

19.     Second, AmPharm changed the dates on refill prescriptions on invoices submitted to Medicare Prescription Drug Plans ("PDPs") for Part D patients, after Medicare denied payment for the refills because they had been submitted prematurely. This allowed AmPharm to bill Medicare for as many refills per year as possible, and also resulted in more recycled drugs.

20.     Third, AmPharm frequently billed both Medicare PDPs and the THM nursing homes for the same prescription without regard to whether the prescription was for a Part A or D patient.  Thus Ampharm billed Medicare for drugs that had been prescribed to Part A patients for whom Medicare was also paying the home as part of the per diem rate. This was done independently of whether any of the pills in the prescription were returned and recycled.  If they were, a credit would be automatically generated in AmPharm's computer billing system, but AmPharm would create an offsetting debit to remove the credit, without reimbursing Medicare or the home.

## II.     The Recycling Program

21.     AmPharm's principal mechanism for overbilling Medicare was its drug recycling program.  AmPharm ordered medications in bottles of 250 or 500 pills from Cardinal, its sole supplier.  Each pill bottle came with a National Drug Code ("NDC") number, which appeared on the bill submitted to Medicare, and also contained a lot number and expiration date.  Each pill stayed in the Cardinal bottle in the pharmacy until prescribed.  At that time, the pharmacist removed from the bottle the number of pills needed to fill a certain prescription, and those pills were billed at that NDC rate to Medicare.

22.     The prescription was then billed to Medicare as part of the monthly bill AmPharm sent to Medicare for that patient, which listed each prescription separately and

- 6 -

1080879.3

noted the NDC code. Under normal circumstances, as soon as all the pills in the bottle were prescribed, a new bottle would be ordered from the supplier so that more prescriptions could be filled. If AmPharm had been following proper procedures, each pill would have been billed to Medicare once. Instead, however, AmPharm improperly recycled the drugs to fraudulently bill Medicare multiple times for a single pill.

23.     AmPharm collected unused medications from THM nursing homes when patients, for whatever reason, left the facility. AmPharm sent four to five drivers, including Johnny Maness, Ed Arana and Kenny to all of THM's nursing homes each evening to pick up any unused medications for those patients who had departed the facility (due to death, switching to another nursing home, or returning to live at home), or whose prescriptions had changed. Those medications were delivered in bulk back to AmPharm's office. Then the Pharmacy Director, Brad Hopkins, required all staff—including those without pharmaceutical training, such as janitors—to sort the medication into baskets and reinsert the drugs into their respective Cardinal bottles. During the recycling process the medications were sometimes in bottles, but sometimes simply loose. Relators and other staff members observed unrefrigerated medication, loose and deteriorating pills, and powdery residue from the tote bags used for delivery. Relators also observed the return, sorting and reuse of controlled substances, such as Lorazepam.

24.     On several occasions, Hopkins, seeking to allay the safety concerns of staff, told Relator Spencer that "all any of these drugs do is make you pee or poop."

25.     Newly recycled pills were continually reinserted into the Cardinal bottles and re-prescribed from that bottle. AmPharm went extended periods without having to order new

pills from Cardinal because the recycling program kept a steady (and free) supply coming into the pharmacy.  Nonetheless, every time AmPharm filled a prescription, Medicare was billed for the cost.  One prescribed bottle of pills could have several lives, as the pills contained in it could be prescribed and returned over and over again.

A. **Governing Regulations and Guidelines**

26.     AmPharm also caused the THM homes to submit false claims to Medicare for Part A patients. The bills submitted by the homes were false because the per diem charges encompassed pharmacy services that violated regulations regarding reuse of drugs and put patients' safety at risk.  Medicare would not have reimbursed the homes if it had known of the recycling.

27.     AmPharm's drug recycling scheme violated various state and federal regulations and guidelines designed to ensure patient safety.

28.     Part 423 of Title 42 of the Code of Federal Regulations "sets forth requirements, limitations, procedures and payments for organizations participating in the Voluntary Medicare Prescription Drug Program.  A "Part D sponsor refers to a PDP sponsor [and] MA organization offering a MA-PD plan . . . and a cost plan offering qualified prescription drug coverage."  42 C.F.R. 423.  Pursuant to 42 C.F.R. 423.120(a)(5), which governs access to long-term care pharmacies such as AmPharm, "a Part D sponsor must offer standard contracting terms and conditions, including performance and service criteria for long-term care pharmacies that CMS specifies, to all long-term care pharmacies in the service area."

29.     Section 50.5.2 of the Prescription Drug Benefit Manual authored by the Centers for Medicare & Medicaid Services establishes that "to participate in Part D sponsor LTC [long term care] pharmacy networks, a pharmacy must be capable of meeting certain minimum performance and service criteria (and relevant State laws governing the practice of pharmacy in the LTC setting)."  The second performance and service criterion required to be incorporated into a Part D sponsor's standard network contract for those pharmacies that would like to be designated long term care pharmacies states that such pharmacies "must be responsible for return for destruction and/or disposal of unused medications following discontinuance, transfer, discharge, or death as permitted by the State Boards of Pharmacy. Controlled substances and out of date substances must be disposed of within State and Federal guidelines."

30.     The Rules of the Tennessee Board of Pharmacy state that it is unlawful for a pharmacy to "receive from any patient or other person the return of any portion of an order that has been taken from the premises of the pharmacy….unless in unit dose packaging, unopened commercially prepackaged containers and in the professional judgment of the … the medications or related materials meet all federal and state board standards for product integrity." *Id.*, Rules 1140-03-.03(8); 1140-4-.10.

31.     Similarly, FDA's Compliance Practice Guide, CPG Sec. 460.300, states the following regarding "return of unused prescription drugs to pharmacy stock":  "A pharmacist should not return drugs products to his stock once they have been out of his possession.  It could be a dangerous practice for pharmacists to [do so] because he would no longer have any assurance of the strength, quality, purity or identity of the articles…The pharmacist or

doctor dispensing a drug is legally responsible for all hazards of contamination or adulteration that may arise, should he mix returned portions of drugs to his shelf stocks. Some of our investigations in the past have shown that drugs returned by patrons and subsequently resold by the pharmacist were responsible for injuries."

32.     AmPharm opened sealed bottles when engaging in recycling, with pills sometimes left loose for significant periods of time.[1]  AmPharm had untrained personnel sort and handle the returned drugs.  No attention was paid to expiration dates, so expired drugs were mixed with unexpired drugs. Those sorting the drugs sometimes could not even distinguish dosage or even type of drug, creating the risk that different dosages and types of drugs were mixed together.

33.     The recycling of controlled substances is contrary to law under the Controlled Substances Act and Drug Enforcement Agency regulations. AmPharm recycled controlled substances such as Lorazepam.

34.     The U.S. Pharmacopeial (USP) Official Standards state that if "a product is refrigerated, it shall not be repackaged unless proper environmental conditions and suitable materials are available." *Id.* at USP 31-nf26s1_c, Section 1146 (2008).  During the recycling process, AmPharm left insulin unrefrigerated for significant periods of time.

35.     In addition to Hopkins, those who helped facilitate the unlawful drug recycling program include Amy Cruse, Vice President of Operations and Compliance, Barb Knutilla and Rhonda Maness.

---

[1] During Relators' tenure at AmPharm, AmPharm distributed drugs in bottles, not in unit dose packaging such as blister packs.

### III.    Billing of Multiple Payors

36.    AmPharm frequently billed both Medicare PDPs and the THM nursing homes for the same prescription, without regard to whether the prescription was for a Part A or D patient. This scheme typically worked as follows: AmPharm would bill a prescription for, say, Lexapro, to a Medicare PDP for a Part D patient.  Payment from the PDP would then be pending.  In the next week or so, Hopkins would suddenly announce that all prescriptions for Lexapro should be billed to the homes that month.  These announcements came to be known by AmPharm employees as "Brad's Rules," and would differ in timing and content from month to month.  Employees would try to keep up with them using charts that were quickly outdated.  Once such a Rule was announced, employees would go into Ampharm's computer system and change the payor to the home, which would then be invoiced.

37.    Medicare was not reimbursed once this change was made, however.  Thus Ampharm falsely billed Medicare for drugs that had been prescribed to Part A patients, for whom Medicare was also paying the home as part of the per diem rate. This occurred independently of whether any of the pills in the prescription were returned and recycled.

### IV.    False-dating of Prescription Refills

38.    AmPharm fraudulently changed the dates on refills on when seeking authorization for them from Medicare PDPs for Part D patients.  Medicare PDPs do not authorize refills until after a certain time period, typically until 75% of the existing prescription has been used. AmPharm routinely sought to refill prescriptions earlier than that date, however. If a refill was rejected by Medicare PDPs as premature, AmPharm overrode the actual date of the refill and entered a false later date, and then resubmitted the refill

request to the Medicare PDP to ensure it was approved.[2] AmPharm later submitted a bill for the refill as part of each patient's monthly Medicare bill. AmPharm did not wait until the authorized date to actually fill the prescription, however.

39.     Hopkins made clear at financial meetings that AmPharm needed to bill Medicare PDPs for as many refills as possible, as early as possible. The false-dating scheme resulted in Medicare being billed more often than it should have been for refills. Given that the patient still had medication from the prior fill remaining and thus had no need yet for a refill, it also likely increased the number of pills that were returned to Ampharm and ended up in the recycling pipeline, thus resulting in additional overbilling of Medicare.

40.      Through its false dating scheme, AmPharm overbilled Medicare by $3.4 million per year.

41.     AmPharm falsified dates on refills on drug prescriptions during the entire period of Relators' employment, from January 25, 2011 through Relator Crowell's termination in June 2012.

42.     Defendants' refill scheme was carried out at AmPharm's offices and THM's nursing homes.

43.     Rhonda Maness, Supervisor of the AmPharm Denials Department and others staff members in her department, including Debra Newman, implemented the date overrides. Cruse supervised Maness approved the false dating scheme and allowed it to continue.

_____

[2] AmPharm receives a response from Medicare PDPs immediately when it enters a refill in their online software.

1080879.3

## V.     Relators Discovery of the Violations

44.     Relator Spencer served as Vice President of Finance at AmPharm from January of 2011 to March of 2012.  As noted earlier, in that position she oversaw accounting and billing and was the final point of escalation for accounts receivable. She was also responsible for overseeing posting of Medicare payments.

45.     Spencer was told when she was hired by James Smith, CEO of AHC, AmPharm and THM, and by Anne Vise, CFO of THM, that her position had been created after an internal audit found systemic problems at AmPharm. Spencer was told that among other things, the audit found a credit balance of $500,000, which the company needed to reconcile.

46.      She understood that her role was to clean up AmPharm's accounting and billing practices. It became apparent, however, that AmPharm only wanted her to make it look like the books had been cleaned up.

47.     Soon after starting, Spencer was told by several people that there were problems with billing and that it "had always been that way."  Spencer conducted a detailed review of all Medicare billing from 2010 to 2012, as well as some billing from 2009, reviewing documents and asking questions of Amy Cruse, Rhonda Maness, and others. Spencer put the pieces together and realized that AmPharm had engaged in rampant overbilling of Medicare through recycling of returned drugs.  She brought this to the attention of AmPharm's Pharmacy Director, Brad Hopkins, and sought to have AmPharm reimburse Medicare.  Hopkins complained in approximately September of 2011 that she was "killing him with the refund requests" and told her to "stop bringing them to me."

- 13 -

48.     After attending a compliance training session and researching drug recycling rules, Spencer sent a report to THM's Compliance Officer, Barb Knuutila, on February 26, 2012, detailing her concerns regarding non-compliance at AmPharm. The report specifically mentioned the drug recycling and overbilling resulting from same, and the false dating of prescriptions. She also sent the new CEO, Dennis Berry, the Tennessee Board of Pharmacy regulation regarding drug recycling cited above. Two weeks later, on March 15, 2012, she was terminated on the grounds that her "management style was too disruptive," despite her recent highly favorable performance evaluation. She has since found another position.

49.     Relator Anna Crowell served as Accounts Receivable Clerk at AmPharm from April 2011 to June 2012. In that position she received all payments that came into the building from all payer sources, including Medicare PDPs and the homes, posted the payments and sent them to the bank.

50.     Crowell left AmPharm because she became aware of its fraudulent schemes and did not believe she could report them to anyone at AmPharm without being fired. She had seen what happened when Spencer reported violations.

## VI.     Retaliation

51.     Relators bring claims against Defendants for retaliation under the False Claims Act, 31 U.S.C. § 3730(h), and pendant state court claims for retaliation under the Tennessee State Whistleblower Statute, Tenn. Code Ann. § 50-1-304(a), (d)(1), and Tennessee common law. Relator Spencer was fired after attempting to correct AmPharm's fraudulent billing practices and reporting them to AmPharm Compliance Officer Barb Knuutila, despite a recent highly positive performance evaluation. Relator Crowell was

constructively discharged because she did not wish to participate in AmPharm's fraudulent schemes but reasonably feared that she would be terminated for not doing so or for reporting the schemes within AmPharm or THM or to outside authorities.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### False Claims Act, 31 U.S.C. § 3729(a)(1)

52.     Relators repeat and reallege each and every allegation contained in all preceding paragraphs as though fully set forth herein.

53.     This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

54.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1)(A).

55.     By virtue of the acts described above, Defendants knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim within the meaning of 31 U.S.C. § 3729(a)(1)(B).

56.     The United States, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid claims that would not have been paid but for Defendants' unlawful conduct.

57.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial

- 15 -

1080879.3

58.     Additionally, the United States is entitled to the maximum penalty of $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of Defendants' conduct described herein.  31 U.S.C. § 3729(a)(1)(G).

## SECOND CAUSE OF ACTION

### Retaliation, 31 U.S.C. § 3730(h)

59.     Relators repeat and reallege each and every allegation contained in all preceding paragraphs as though fully set forth herein.

60.     This is a claim for damages and relief available under a provision of the federal False Claims Act, 31 U.S.C. § 3730(h).

61.     Relators are entitled to relief, as AmPharm discharged them and discriminated against them in the terms and conditions of their employment because of their lawful acts in furtherance of an action under 31 U.S.C. § 3730 or their efforts to stop violations of the False Claims Act.

## THIRD CAUSE OF ACTION

### Retaliatory Discharge under Tennessee Common Law

62.     Relators repeat and reallege each and every allegation contained in all preceding paragraphs as though fully set forth herein.

63.     Relators allege that they suffered retaliatory discharges under Tennessee common law due to their efforts to address the violations that Defendants were engaged in with respect to the handling of medication and billing.

- 16 -

1080879.3

## FOURTH CAUSE OF ACTION

### Tennessee State Whistleblower Statute, Tenn. Code Ann. § 50-1-304(a), (d)(1)

64.     Relators repeat and reallege each and every allegation contained in all preceding paragraphs as though fully set forth herein.

65.     This is a claim for damages and relief available under the Tennessee State Whistleblower Statute, Tenn. Code Ann. § 50-1-304.

66.     By virtue of the acts described above, Defendants discharged or terminated Relators solely for refusing to participate in, or refusing to remain silent about, illegal activities, within the meaning of Tenn. Code Ann. § 50-1-304.

67.     By virtue of the acts described above, Relators refused to participate in or remain silent about activities in violation of the civil code of the United States or other regulations intended to protect the public health, safety and welfare, within the meaning of Tenn. Code Ann. § 50-1-304(c).

68.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial

## PRAYER

69.     WHEREFORE, Relators pray for judgment against Defendants as follows:

a.     Judgment in an amount equal to 3 times the amount of each claim for compensation by Defendants, plus a civil penalty of $10,000 for each violation of 31 U.S.C. § 3729(a)(1).

b.     An award to each Relator of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d).

- 17 -

1080879.3

c.    All relief to which Relators are entitled under 31 U.S.C. § 3730(h).

d.    Damages to each Relator pursuant to Tenn. Code Ann. § 50-1-304(d)(1).

e.    Attorneys' fees, expenses and costs of suit herein incurred, pursuant to 31 U.S.C. § 3730(d) and Tenn. Code Ann. § 50-1-304(d)(2).

f.    All compensatory damages, including lost wages, lost earning capacity, and damages for emotional distress, and embarrassment, attorneys' fees, costs, and prejudgment and post-judgment interest, punitive damages, any other damages, available under Tennessee common law for retaliatory discharge.

g.    An injunction against each of the Defendants for any continuing conduct violating 31 U.S.C. § 3729(a)(1);

h.    An order directing Defendants to cease and desist from violating 31 U.S.C. § 3729(a)(1).

i.    Such other and further relief as the Court deems just and proper.

Dated: March 15, 2013          Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By:_____
        Mark P. Chalos

Mark P. Chalos (TN State Bar No. 19328)
mchalos@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
150 Fourth Avenue, North, Suite 1650
Nashville, TN 37219-2423
Telephone: (615) 313-9000

- 18 -

Facsimile: (615) 313-9965


Robert J. Nelson (CA State Bar No. 132797)
rnelson@lchb.com
Lexi J. Hazam (CA State Bar No. 224457)
lhazam@lchb.com
Lisa J. Cisneros (CA State Bar No. 251473)
lcisneros@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
*To be admitted pro hac vice*


Teresa A. Luna (TN State Bar No. 26447)
tluna@spraginslaw.com
SPRAGINS, BARNETT & COBB, PLC
P.O. Box 2004, 312 E. Lafayette Street
Jackson, TN 38302
Telephone: (731) 424-0461
Facsimile: (731) 424-0562


Attorneys for Relators

1080879.3

**JURY TRIAL DEMANDED**

Dated: March 15, 2013                 Respectfully submitted,

                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

                                      By:_____
                                                Mark P. Chalos

                                      Mark P. Chalos (TN State Bar No. 19328)
                                      mchalos@lchb.com
                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                      150 Fourth Avenue, North, Suite 1650
                                      Nashville, TN 37219-2423
                                      Telephone: (615) 313-9000
                                      Facsimile: (615) 313-9965


                                      Robert J. Nelson (CA State Bar No. 132797)
                                      rnelson@lchb.com
                                      Lexi J. Hazam (CA State Bar No. 224457)
                                      lhazam@lchb.com
                                      Lisa J. Cisneros (CA State Bar No. 251473)
                                      lcisneros@lchb.com
                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                      275 Battery Street, 29th Floor
                                      San Francisco, CA 94111-3339
                                      Telephone: 415.956.1000
                                      Facsimile: 415.956.1008
                                      *To be admitted pro hac vice*


                                      Teresa A. Luna (TN State Bar No. 26447)
                                      tluna@spraginslaw.com
                                      SPRAGINS, BARNETT & COBB, PLC
                                      P.O. Box 2004, 312 E. Lafayette Street
                                      Jackson, TN 38302
                                      Telephone: (731) 424-0461
                                      Facsimile: (731) 424-0562

                                      Attorneys for Relators

- 20 -

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing First Amended Complaint, was served by hand the 15th day of March, 2013, upon the following:

United States Attorney for the Middle District of Tennessee.

By: _____

Mark P. Chalos

Mark P. Chalos (TN State Bar No. 19328)
mchalos@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
150 Fourth Avenue, North, Suite 1650
Nashville, TN 37219-2423
Telephone: (615) 313-9000
Facsimile: (615) 313-9965